IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, ) | CR 10-01592-TUC-CKJ (GEE) |
| Plaintiff, ) | **REPORT AND RECOMMENDATION** |
| vs. ) | |
| VICTORIANO CRISOSTO-VERA, ) | |
| Defendant. ) | |

The District Court referred this case to the Magistrate Judge for hearing on pretrial motions. Hearing on the defendant's Motions to Suppress was held on March 22, 2011. Upon consideration of the evidence presented and the arguments of respective counsel, the magistrate recommends the District Court, after its de novo review, **DENY** the Motions to Suppress.

**CHARGES:**

The three-count indictment charges the defendant with: (1) possession of a firearm by an illegal alien, (2) possession of a firearm by a convicted felon, and (3) illegal re-entry.

**MOTIONS TO SUPPRESS:**

The defendant argues that: (1) evidence should be suppressed because it was obtained pursuant to an illegal search of his residence, and (2) his statements should be suppressed

1  because they were not voluntary and were obtained in violation of *Miranda.*

2  ***Testimony of Saul Pumarejo (ICE)*:**

3     Pumarejo was assigned to a task force with the responsibility of locating previously
4  deported/removed individuals believed to again be in this country illegally. In attempting
5  to locate Paulina Recio-Acosta he went to her formerly listed address, and the occupants
6  there advised they were her tenants and stated she resided on Walker Place in Tucson**.**
7  Pumarejo was also advised that Recio-Acosta resided with a man who often carried a gun.
8  Pumajero then proceeded to the address on Walker Street where a man answered the door
9  who identified himself as Jorge Recio-Gonzalez, the father of Paulina Recio-Acosta. The
10 agent identified himself as an immigration agent, and asked for his daughter Paulina, and was
11 advised she was inside the residence. After a short time Paulina Recio-Acosta came outside
12 the house along with the defendant who identified himself as Victorianao Crisosto-Vera--the
13 husband of Recio-Acosta. Recio-Gonzalez, Paulina's father, advised he was legally in this
14 country and this was confirmed. Paulina Recio-Acosta and the defendant admitted they had
15 no legal authority to be in the country. After confirming telephonically (through their law
16 enforcement support center) that the defendant had no documents to be in the U.S. legally,
17 the defendant and his wife were taken into custody, although neither was handcuffed at that
18 time.

19    Pumajero testified that after he placed the defendant under arrest, Crisosto-Vera asked if
20 he could go back into the residence to get his ID and change clothes. The agent stated he
21 asked both Jorge Recio-Gonzales and the defendant if agents could accompany the defendant
22 into the house and both consented. Pumajero stated that for officer safety (especially in light
23 of the information they had earlier received) he asked the defendant if there were any guns
24 in the residence. The defendant made no response. He then asked the defendant's wife if
25 there was a firearm present and she responded that she had not seen the gun in two weeks.
26 The agent then relayed this information to the defendant and asked about the location of the
27 gun. The defendant admitted he had a gun in the house, indicated its location, and advised
28 he had removed the magazine from the gun as soon as he heard the "police" were at the

1  residence. The firearm and a magazine of ammunition were located. The defendant was then
2  read his *Miranda* rights and placed in handcuffs.  The defendant agreed to speak with the
3  agent without the presence of a lawyer. Pumarejo stated he never asked the defendant any
4  questions relating to the possible criminal charge arising from the gun possession; rather his
5  questioning was limited to the immigration offense. Pumajero testified that later that day he
6  again gave the defendant *Miranda* warnings at the Border Patrol station and took a statement
7  from him.  (*See* Exhibit A attached hereto.)

8  During cross-examination Pumarejo testified that the task force to locate previously
9  deported persons believed to have re-entered the country illegally received its list of
10 "suspects" from the supervisor, and he (Pumarejo) did not know how Paulina Recio-
11 Acosta's name got on that list.  He also admitted that anyone on the list who is located
12 would be guilty of illegal re-entry. The person at the trailer he initially contacted regarding
13 Ms. Recio-Acosta's whereabouts not only gave the Walker Place address for her and advised
14 that her husband carried a gun, but also advised the husband's name was "Crisosto" and that
15 he was illegally in this country. Pumajero admitted that before going to the Walker Place
16 residence he ran that name through their database to determine if Crisosto had an
17 immigration record. However, no record was found because they did not have a full name
18 or a birth date.

19 After having Pumarejo re-state that safety is always an important concern for law
20 enforcement officers, defense counsel questioned the reasonableness of allowing Ms. Recio-
21 Acosta's father to go back into the house to get her and her husband (who was rumored to
22 carry a gun). Pumarejo stated Ms. Recio-Acosta's father did *not* re-enter the house and, in
23 fact, did not even tell them Crisosto was in the house. Rather, Pumarejo asked the father if
24 Ms. Recio-Acosta could come out of the house to speak with agents. Ms. Recio-Acosta *and*
25 Crisosto then came out of the house together. Asked why they had not approached the house
26 "with some sort of tactical unit, a SWAT team, something like that", Pumarejo stated they
27 "had plenty of agents" and "as a precautionary measure" they had already decided they
28 wanted to encounter Ms. Recio-Acosta outside the residence because it would be safer given

- 3 -

1    the information they had received that her husband frequently carried a gun.

2    Pumarejo testified Ms. Recio-Acosta was taken into custody because it was already
3    known she was here illegally, and Crisosto was arrested after he stated he was in the country
4    illegally. Both those individuals were separated outside the house but were not handcuffed.
5    There were approximately 7-9 law enforcement officers outside the Walker Place residence
6    at that time. Pumajeo admitted it was his decision to allow Crisosto to return to the house
7    unhandcuffed to recover some clothes and ID; Pumarejo stated he and two agents
8    accompanied the defendant into the house. Photos taken at scene demonstrate that when
9    taken into custody the defendant was barefoot, and wearing pants and a tank top. Pumarejo
10   testified the defendant put on shoes and another shirt, and recovered his ID. Pumarejo
11   admitted that following an arrest a suspect's clothing and ID are taken from him once he is
12   eventually delivered to the jail or lockup facility.

13   *Testimony of Bernardo Arellano (ATF)*

14   Arellano testified that on June 15th he received a call from Pumarejo that he had a case
15   involving a suspected federal firearms violation; Arellano stated this is a regular procedure
16   with ICE and other law enforcement agencies. Arellano stated he and an agent Timbane
17   went to the ICE office and were shown the seized firearm and a magazine loaded with
18   ammunition. They took custody of the items and spoke with Crisosto-Vera. Pumarejo
19   advised the defendant had previously been advised of his *Miranda* rights and had waived
20   them.

21   The defendant to confirmed to Arellano that he had been read the *Miranda* rights, that he
22   understood and waived those rights, and was willing to speak to Arellano. The defendant
23   also declined to have the rights read again. Arellano testified he speaks fluent Spanish and
24   he and the defendant conversed in Spanish. Arellano stated he wanted to get details of how
25   the defendant came into possession of the gun. Arellano stated the defendant showed no
26   hesitancy in answering his questions and was cooperative throughout.

27   Arellano testified he interviewed the defendant again on June 16th at 11:55 a.m. after he
28   and agent Timbane had picked him up from the Border Patrol station and taken him to the

- 4 -

1  ATF office for processing before taking the defendant to court for an initial appearance. This
2  interview was digitally recorded and Arellano advised the defendant of his *Miranda* rights.
3  The defendant indicated he understood the rights, waived them, and answered questions.

**DISCUSSION:**

*Motions to suppress evidence and statements*

The thrust of the defendant's arguments is that the defendant's consent for the agent's to accompany him into the residence, the defendant's statements admitting possession of the gun and stating its location should be suppressed because they were involuntary and obtained in violation of the defendant's *Miranda* rights. Consequently, the gun must also be suppressed as it was seized as a result of these involuntary statements.

While it is true the agents made a warrantless entry into the defendant's residence, the government argues that entry was with the defendant's consent; in fact, the uncontroverted testimony of Pumarejo is that the defendant himself asked to re-enter the residence to get clothing and his ID. Before granting that request the agent requested the consent of the defendant and his father-in-law to have the agents enter with the defendant. Therefore, the defendant clearly understood he would not be permitted to re-enter the residence without the agents accompanying him. Presumably, the defendant could have then withdrawn his request.

Perhaps more to the point, after the defendant's request to re-enter the residence, and after securing the consent of the defendant to accompany him into the residence, Pumarejo asked about the presence of a gun in the residence and its location. *Miranda v. Arizona,* 384 U.S. 436 (1966) prohibits the custodial interrogation of a person unless the person has first been advised regarding his *Miranda* rights. There is no question the defendant was in custody at that time, although he had not been handcuffed, and that he had not yet been read his *Miranda* rights.

The next question then is whether questioning regarding the gun must be considered "interrogation." The court has held that not every question in a custodial setting constitutes

interrogation, *United States v. Gonzales-Sandoval,* 894 F.2d 1043, 1046 (9th Cir. 1990)(citing *United States v. Booth,* 669 F.2d 1231, 1237 (9th Cir. 1981)). Questions regarding "public safety" have been found not to trigger *Miranda.* "[U]nder the public safety exception, *Miranda* warnings need not be given when 'police officers ask questions reasonably prompted by a concern for the public safety.'" *Allen v Roe,* 305 F. 3d 1046, 1050 (9th Cir. 2002). "In order for the public safety exception to apply, there must have been 'an objectively reasonable need to protect the police or the public from immediate danger.'" *Allen,* 305 F.3d at 1050 (citation omitted).

In the present case Pumarejo stated several times during his direct and cross examination that he was motivated by a concern for the safety of himself and other officers when he asked about the presence and location of a gun before he re-entered the defendant's residence. Initially, he had been advised while attempting to locating Paulina Recio-Acosta that she lived with a man who often carried a gun. The defendant made no response when Pumarejo directly asked him about the presence of a gun in the residence; the defendant did not deny the presence of the gun, nor did he withdraw his request to re-enter the residence. The defendant's wife responded she had not seen the gun in two weeks. Confronted with this information, the defendant then admitted the presence of a gun and stated its location. Pumarejo testified given the defendant's request to re-enter the home it was his custom to ask about the presence of any weapons because of his concern for officer safety.

This court concludes that given the above circumstances Pumarejo had an objectively, reasonable concern for officer safety when he questioned the defendant about the presence of a gun in the residence and, therefore, that questioning is exempt from a *Miranda* analysis. It should be noted that the defendant suggests that the number of officers at the scene may have overborne his will. However, there was no testimony that anyone but Pumarejo questioned the defendant; nor is there any evidence the officers encroached upon the defendant's personal space with drawn weapons or taunts. Furthermore, this court finds that the agents' entrance into the residence was pursuant to a valid consent of the defendant; in fact, the defendant requested to re-enter the home, and never withdrew this consent even after

he undedrstood the agents would accompany him.

**RECOMMENDATION:**

In view of the foregoing, the magistrate recommends that the District Court, after its de novo review of the record, **DENY** the defendant's Motions to Suppress.  Any party may file objections within 14 days after being served with a copy of this Report and Recommendation. If objections are timely filed, the party's right to de novo review may be waived.  If objections are filed, the parties should direct them to the District Court **by omitting the magistrate's initials from the caption.**

This Report and Recommendation is being faxed to all counsel on today's date.  The Clerk of the Court is directed to send a copy of this Report and Recommendation to all counsel.

DATED this 10th day of June, 2011.

/s/ Glenda E. Edmonds
Glenda E. Edmonds
United States Magistrate Judge